NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0085n.06

No. 08-3750

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 10, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| JOSELIN CASTRO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: GUY, CLAY, and WHITE, Circuit Judges.

**WHITE, Circuit Judge.** A grand jury charged defendant Joselin Castro (Castro) in a two-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute 9.84 grams of a substance containing heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Castro filed a motion to suppress evidence obtained during a traffic stop and subsequent search of his residence, and requested a *Franks*[1] hearing. The district court denied Castro's motion to suppress. Castro pleaded guilty as charged pursuant to a conditional plea agreement that preserved his right to appeal the denial of the motion to suppress. The district court sentenced him (as a career offender) to 120 months' imprisonment on each count, to run concurrently. On appeal, Castro challenges the denial of his motion to suppress. We AFFIRM.

---

[1]*Franks v. Delaware*, 438 U.S. 154 (1978).

**I**

The facts[2] are set forth in the district court's order denying Castro's motion to suppress:

> According to Cleveland Police Department ("CPD") Detective Maria Matos ("Detective Matos"), about four months before the May 22, 2007 arrest and search of Castro and his residence, she received an anonymous telephone call informing her of Castro's activities. Detective Matos testified that the anonymous caller informed her that Castro and other members of his family were dealing heroin out of their residence. Detective Matos stated that the caller provided her with Castro's address (2180 West 83rd Street, Cleveland, Ohio, hereinafter the "Castro residence") and a description of the vehicles Castro often would drive. As a result of this tip, Detective Matos testified that she began to conduct informal surveillance of the Castro residence by periodically monitoring the house. During the course of her informal surveillance, Matos observed an unusually high amount of traffic in and out of the Castro residence.

> On May 22, 2007, Detective Matos testified that the CPD was targeting Castro's neighborhood for enforcement because it was known to be a "hot spot" – an area in which a high concentration of illegal, drug-related activity took place. At approximately 1:00 p.m. Detective Matos, operating undercover, approached the Castro residence in her unmarked vehicle. She testified that she observed a gray Toyota station wagon ("Castro's vehicle") illegally parked (facing against traffic) on the side of the street in front of the Castro residence. Detective Matos stated that she observed Castro and a white male enter the illegally parked vehicle. According to Detective Matos, the white male started the car and drove it into Castro's driveway, driving initially on the wrong side of the street in order to do so. According to Detective Matos, at that time she contacted CPD Sergeant Kevin Kelly ("Sergeant Kelly"), and advised him of the traffic violation. Detective Matos then observed Castro exit the car, briefly enter the residence, and return to the car. Once Castro returned to the car, the driver backed out of the driveway and departed the residence. Detective Matos followed Castro's vehicle, broadcasting its location so that officers in a marked vehicle could initiate a traffic stop.

> At the suppression hearing, Sergeant Kelly testified that Detective Matos informed him that she observed the gray Toyota station wagon committing a traffic violation and asked him to stop the vehicle. According to Sergeant Kelly, once he

---

[2]Neither party asserts that the district court's factual findings were clearly erroneous.

observed the vehicle, he and Detective Fallon stopped it with the assistance of the zone car [black and white marked CPD cruiser in the vicinity].

Once the vehicle was stopped, Sergeant Kelly approached it to ask the driver for his license. Sergeant Kelly determined that the driver of the vehicle did not have a valid license, and asked him to step out of the vehicle so he could be arrested for driving under a suspended license. When the driver exited the vehicle, Sergeant Kelly testified that he observed a small piece of folded paper on the floor of the car with what appeared to be narcotics spilling out of it. Sergeant Kelly advised Detective Fallon, who was on the passenger's side of the car, that he found drugs. According to Kelly, at that time Detective Fallon removed Castro from the vehicle and, in the process of removing Castro, discovered a second piece of folded paper on the floor of the vehicle that also appeared to contain narcotics. This discovery prompted Detective Fallon to conduct a pat down of Castro's person, during which he discovered a bag of heroin. As a result, Castro was placed under arrest, advised of his rights, and placed in the marked police car.

Sergeant Kelly further testified that, immediately after Castro's arrest, he contacted Detective Matos and advised her that they had found narcotics during the traffic stop. Detective Matos and Sergeant Kelly then decided to call Jennifer Driscoll ("Driscoll") at the Cuyahoga County Prosecutor's office, advise her of the investigation and arrest of Castro, and seek a warrant to search Castro's residence. According to Detective Matos, Driscoll informed them that they had enough information to obtain a search warrant, and advised Detective Matos to meet with her to begin preparing the documents necessary for the warrant. Detective Matos testified that she went to the prosecutor's office, met with Driscoll, and that Driscoll generated a warrant and an affidavit. Detective Matos stated that she signed the affidavit in front of the judge, and that everything in the affidavit was true.

While Detective Matos was in the process of securing a warrant, Sergeant Kelly and other members of the vice squad returned to Castro's residence to secure the premises. According to Sergeant Kelly, once they arrived at the residence, the CPD officers approached the home with their guns drawn and saw some movement through the curtains. Sergeant Kelly testified that he knocked on the rear door of Castro's residence and was greeted by Castro's mother. Sergeant Kelly said that he told Castro's mother that the police were at the home in connection with a drug investigation. Sergeant Kelly said that Castro's mother allowed them to enter the home, but he did not remember the substance of any conversation he may have had while seeking permission to enter. Once Sergeant Kelly was in the home, he noticed

a scale on the dining room table. He then proceeded to conduct a protective sweep of the home, during which he discovered a rifle in a closet.[3]

As soon as the warrant was signed by the judge, Detective Matos contacted Sergeant Kelly, who was already at the Castro residence, and told him that the warrant was signed. Detective Matos testified that she then went to the Castro residence to meet with Sergeant Kelly and conduct a search of the house. The search of Castro's residence revealed weapons, ammunition, additional quantities of heroin, and scales.

## II

Detective Matos's affidavit in support of the search warrant for Castro's residence incorrectly stated that a confidential informant provided a tip regarding Castro; in fact, an anonymous source provided the tip. Following a suppression hearing, the district court struck the reference to a confidential informant from the affidavit, and examined the affidavit as though the tip had come from an anonymous source. The district court's order denying Castro's motion to suppress states in pertinent part:

> Castro . . . argues that the reference to a confidential informant is recklessly misleading and must be omitted from the probable cause analysis. As explained below, the Court agrees as to the misleading nature of the reference, but finds that completely striking the information relating to the CI is not the proper remedy.

> At the suppression hearing, Detective Matos testified that she did not know the identity of the person who first, and repeatedly, informed her that Castro was selling narcotics out of his residence. The affidavit in support of the search warrant, however, refers to the source of Detective Matos's information as a "confidential informant." Castro argues that the use of the term confidential informant is misleading because it conveys the impression that the informant is known to the police and, perhaps, that the informant regularly provides law enforcement officers

---

[3]The district court determined that this initial warrantless search of Castro's residence was improper.

with information. Indeed, discussing the difference between an anonymous tipster and a confidential informant, the Sixth Circuit stated: "the distinction is relevant whenever tips are at issue in a warrant application. It should be readily familiar to police officers, so disregarding it suggests recklessness." United States v. Elkins, 300 F.3d 638, 651 (6th Cir. 2002). According to the Sixth Circuit, it is appropriate for a Court to strike a portion of the affidavit that erroneously describes a tipster as a confidential informant. It is not necessary, however, to remove all reference to the tip from the affidavit. Id. Instead, the affidavit may be examined as though the tip came from an anonymous informant. Id. The tip, therefore, still warrants consideration albeit of a somewhat different nature, in the context of the Court's analysis of the totality of the circumstances. [Citations to the record omitted.]

**A**

Castro argues that the district court erred by inserting the correct information into the warrant affidavit rather than simply striking the recklessly false information. Castro asserts that the district court erroneously held that *United States v. Elkins*, 300 F.3d 638 (6th Cir. 2002), blazed a new path in Fourth Amendment jurisprudence, allowing a district court to repair ex post facto an affidavit containing recklessly false statements by substituting the correct information. He argues that this court in *Elkins*, did not *replace* the recklessly false statement that a confidential informant was the source of information, but rather, the court relied on the fact that the same affidavit contained other references to the source, and correctly described the source as an anonymous source rather than a confidential informant. Castro asserts that to allow a district court to repair a defective affidavit in support of a search warrant ex post facto would create precedent directly contrary to a core tenet of the Fourth Amendment: the rule that an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when the affiant sought the warrant, but not disclosed to the magistrate.

**B**

This court reviews a district court's decision on a motion to suppress under two standards: factual findings are upheld unless clearly erroneous, and legal conclusions as to the existence of probable cause are reviewed de novo. *United States v. Combs*, 369 F.3d 925, 937 (6th Cir. 2004). Generally, this court views the evidence in a light most favorable to the government, *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), and accords great deference to an issuing magistrate's finding of probable cause in a search warrant application. *United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008). "The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983)). However, *Franks v. Delaware*, 438 U.S. 154 (1978), "recognized a defendant's right to challenge the sufficiency of an executed search warrant on the basis that 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause[.]" *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir. 1997), quoting *Franks*, 438 U.S. at 155-56.

**C**

In *Elkins*, multiple properties were involved, and thus several search warrants and affidavits supporting those warrants are discussed. Only the search warrant affidavit regarding 146 Neil Street

is relevant here.[4]  *See Elkins*, 95 F. Supp. 2d at 828 and n.46, 829.  It stated that police had received

information from a confidential informant when, in fact, the information came from an anonymous

caller.  The district court struck the reference to "confidential informant" from the 146 Neil Street

affidavit, noting

> [] Elkins contests the statement that [Officer] Cincinelli received information
> from a confidential informant that Elkins was growing marijuana in the adjacent
> building in the rear of 139 Scott Street, which is 146 Neal [*sic*] Street.  As previously
> held, this characterization of the anonymous caller as a confidential informant is a
> material misrepresentation.  If it was not knowingly false, it was, at the very least,
> stated with reckless disregard for the truth.
>
> This process leaves the court with the following allegations of fact in the
> affidavit supporting the issuance of the warrant for 146 Neil Street:   1) an
> investigation was being conducted into a complaint of an indoor marijuana grow at
> 139 Scott Street and 146 Neil Street; 2) James Elkins owned the buildings at 139
> Street and 146 Neil Street; 3) 146 Neal [*sic*] Street is located behind 139 Scott Street;
> 4) two pounds of marijuana and associated growing equipment was found at 139
> Scott Street; 5) Elkins voluntarily gave his consent to search 146 Neil Street and then
> withdrew it; and 7) the officers observed a pallet of sheep manure fertilizer, which
> is commonly used to grow marijuana, outside 146 Neil Street.  Given these facts, the
> court concludes that the warrant for the search of 146 Neil Street was supported by
> sufficient probable cause in the affidavit.  *United States v. Atkin*, 107 F.3d 1213,
> 1216 (6th Cir. 1997) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L.
> Ed. 2d 527 (1983)).

---

[4]Two of the search warrant affidavits in *Elkins* stated that the police had received information
from a confidential informant when, in fact, the information came from anonymous callers. *United
States v. Elkins*, 95 F. Supp. 2d 796, 826 (1270 Tutwiler), and 827-28 (146 Neil Street) (W.D. Tenn.
2000), *rev'd in part on other grounds*, 300 F.3d 638 (6th Cir. 2002).  The district court concluded
that these were material misrepresentations and struck from both warrants the confidential informant
language.

*Elkins*, 95 F. Supp. 2d at 829. On Elkins's appeal, this Court concluded that the district court

properly excluded the affidavit's reference to a confidential informant while retaining the remainder

of the information regarding the complaint. The court stated:

> [T]he affidavit included a statement that police had received "information from a C/I
> [i.e., confidential informant] that Elkins [was] growing marijuana in . . . 146 Neil."
> The district court found that the police had actually received an *anonymous* tip that
> marijuana was being grown in 155 Scott Street and "the building behind Scott
> Street." 95 F. Supp. 2d at 801 [*sic* 829]. Treating the affidavit's specific reference
> to 146 Neil Street is justifiable in light of the tip's reference to "the building behind"
> 155 Scott Street, the district court nevertheless held that the reference to a
> "confidential informant" in the statement was recklessly misleading and struck it,
> since in fact police had only received a tip from an anonymous caller. 95 F. Supp.
> 2d at 829. We uphold this ruling. The district court permissibly found that the police
> did not know the identity of the informant who complained about the Elkinses'
> property. The phrase "confidential informant," however, implies a tipster whose
> identity *is* known to the police. That is what is kept "confidential." The district court
> did not err in deeming this discrepancy material. Tips from known informants have
> more value than those from unknown ones. The distinction is relevant whenever tips
> are at issue in a warrant application. It should be readily familiar to police officers,
> so disregarding it suggests recklessness. *For these reasons the court did not clearly
> err in excluding from the affidavit the reference to the existence of a confidential
> informant, while retaining the part of the statement that referred to an (anonymous)
> complaint of drug activity in 146 Neil.*

*Elkins*, 300 F.3d at 651 (emphasis added; citations omitted).

Admittedly, the *Elkins* panel did not specifically address an argument that the entirety of the

tip information must be redacted, rather than simply the information that the tip came from a

confidential informant. Nevertheless, Castro's argument that the *Elkins* court did not *replace* the

recklessly false information that a confidential informant was the source of information, but rather,

relied on the fact that the same affidavit contained other references to the source, and correctly

described the source as anonymous, is without merit. The district court's opinion in *Elkins* quoted

the pertinent parts of the unredacted affidavit, and there is no reference in that quoted portion of the affidavit to the source being anonymous.[5] *See Elkins*, 95 F. Supp. 2d at 828 n.46.

Castro relatedly argues that the district court in *Elkins*, unlike the district court in the instant case, relied on *other* parts of the affidavit that were *not* recklessly false to determine whether probable cause existed. As is evident from the portion of the district court's opinion in *Elkins* quoted *supra*, the district court (after striking the reference to the confidential informant) set forth the remaining allegations of fact in the affidavit supporting the issuance of the warrant for 146 Neil Street, among which was that "an investigation was being conducted *into a complaint* of an indoor marijuana grow at 139 Scott Street and 146 Neil Street." (Emphasis added.) *See Elkins*, 95 F. Supp. 2d at 829. Thus, Castro's argument is without merit.

We conclude that, having struck the false reference to a confidential informant from the affidavit, the district court properly read the remainder of the affidavit as though the tip had come from an anonymous source. Reading the affidavit in this manner does not add a fact withheld from the issuing magistrate; rather, it leaves in the information regarding the tip, but removes the assertion that the source was a confidential informant.

## III

Castro contends that the district court also erred in reviewing whether the redacted search warrant affidavit established probable cause "with great deference" rather than *de novo*, where it had

---

[5]The other affidavit in *Elkins* that wrongly referred to a confidential informant, rather than an anonymous source, does not contain any reference to the source being anonymous, either. *See Elkins*, 95 F. Supp. 2d at 826 n.43.

determined that portions of the affidavit were recklessly false.[6]  A review of the district court's opinion reveals that the court engaged in what appeared to be a lengthy *de novo* evaluation of the information in the affidavit, examining whether it established "a sufficient nexus between [Castro's] illegal activity and his residence to allow a search of that residence," and then, in stating its conclusion, invoked the rule that the court must afford great deference to the issuing magistrate's probable cause determination.

Although Castro contends that "with the false information [i.e., all references to the tip] simply excluded, rather than corrected, the remaining information does not give rise to probable cause to search the residence," he does not argue that probable cause was lacking if the district court's examination of the affidavit as though the tip came from an anonymous source was proper.

In any event, applying *de novo* review, we conclude that the remainder of Detective Matos's affidavit provided probable cause to issue the search warrant for Castro's residence.  The remaining portions of Matos's affidavit stated that Matos is a law enforcement officer with substantial training and experience; that through a utilities check, Matos determined that Castro was associated with the 2180 West 83rd street address; that an anonymous informant provided Matos with a tip describing

---

[6]In support of his argument, Castro relies on *Elkins* – and the following language therefrom:

> While in normal circumstances a warrant affidavit's sufficiency is assessed with great deference by . . . reviewing courts, we will review *de novo* the sufficiency of the affidavit here, since at least one portion of it has been validly redacted as recklessly and materially false. [*Elkins*, 300 F.3d at 651.  Internal citations omitted.]

Castro and stating that Castro and his wife were selling heroin from the West 83rd street address; that Matos, on several occasions, surveilled the residence and observed heavy traffic in and out of the residence for short periods of time, which in her experience and training suggested that narcotics deliveries were occurring; that law enforcement officers conducted a legal traffic stop on Castro's vehicle soon after he left the residence, and heroin was found on Castro's person as well as a large quantity of cash and a bag of suspected heroin in the vehicle; that Castro had an extensive criminal history and was on parole; and that once heroin was found on Castro's person, he stated "I'm done, I'm on parole[,] it makes no difference now."

The affidavit provided sufficient information to conclude that Castro was, in fact, involved in the sale of narcotics, on a current basis, and that he conducted some of that activity at the West 83rd Street address.

WE AFFIRM the district court's denial of Castro's motion to suppress.